UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                   :

JEFFREY FANOK,                             :
                                   :

                  Plaintiff,        :    **MEMORANDUM**
                                   :    **<u>DECISION AND ORDER</u>**

          - against -         :
                                   :    CV-07-1921 (BMC) (CLP)
CARVER BOAT CORPORATION, LLC and  :
STATEN ISLAND YACHT SALES, INC.,    :
VOLVO PENTA OF THE AMERICAS, INC. :
and VOLVO PENTA,               :
                                   :

                  Defendants.    :
                                   :

-------------------------------------------------------- X

**COGAN**, District Judge.

      Jeffrey Fanok brings this action against Carver Yacht Corporation, L.L.C., Staten Island

Yacht Sales, Inc. ("SIYS"), Volvo Penta of the Americas, Inc., and Volvo Penta (together,

"Volvo"), which arises from his 59-foot Marquis yacht catching fire and sinking off the coast of

Sandy Hook, New Jersey. Defendants were responsible for the manufacture, sale, and

maintenance of the yacht or its component parts. The case is for economic damages only, the

price of the yacht and attendant expenses, as fortunately no one was injured in the fire (save a

family dog which apparently was killed). Each of the defendants has moved for summary

judgment.

      Plaintiff has produced no evidence that there was anything wrong with the yacht or any

of its components that caused the fire. This may be because his insurance carrier made the

decision to economize on salvage costs and therefore salvaged it through a method that destroyed

most of the vessel instead of retrieving it so that it could be inspected to determine the cause of

the fire. The carrier's contemporaneous notes attending this decision are laudably candid in

recognizing that the decision to salvage the burned vessel in this matter could well doom its effort to prevail in this case, yet here it is anyway, as it has paid Mr. Fanok on his insurance claim and is the most interested party on the plaintiff's side by way of subrogation. (Mr. Fanok's stake is his relatively small deductible).

Plaintiff combines two legal principles in an effort to survive summary judgment: first, that a plaintiff in a strict products liability action need not prove a specific defect when the circumstantial evidence shows that the product did not function as it should have; and, second, that expert testimony, of which he has none, is not necessary to reach a jury in certain cases.

Neither of these principles is adequate to warrant denial of defendants' motions. This is not a strict liability action and in any event, although plaintiff does not have to prove a specific defect, he has to offer some evidence that something was wrong. Putting this case to a jury would be an invitation to speculate, not just as to what the defect was, but more fundamentally, whether there was in fact a defect.

Alternatively, plaintiff asserts various theories against SIYS under the Uniform Commercial Code ("UCC") relating to the delivery of non-conforming goods, and further asserts that the risk of loss remained on SIYS at the time of the fire. These claims are without merit and are also rejected.

## BACKGROUND

On April 22, 2006, plaintiff entered into a purchase agreement with Staten Island Yacht SIYS for a 59-foot Marquis Yacht for the 2005 model year. The purchase price was $1,376,940,

inclusive of six percent tax.[1] It appears that plaintiff, at the time of the incident, had paid

$1,202,940. The yacht was equipped with two engines, manufactured by MTU Detroit Diesel,

and model SP-1300 bow and stern thrusters, manufactured by Volvo. Thrusters are additional

propellers, usually used on larger yachts or ships. They are helpful in tight maneuvers, where

they can propel the yacht sideways (such as into a dock). The engines and thrusters were sold to,

and installed by, Carver. SIYS had used the yacht before, apparently for testing purposes, and

the engines had 90 to 100 hours of engine time on them at the time of the sales agreement.

Carver inspected the yacht in accordance with its manufacturing and quality control

procedures prior to its transfer to SIYS. It passed all inspections. It was then shipped, on

October 25, 2004, in parts, to SIYS, where it was assembled. Upon receipt of the yacht, SIYS

completed a "Pre-Delivery Service Record," confirming the proper operating condition and

seaworthiness of the yacht. When plaintiff and SIYS signed the purchase agreement, SIYS

agreed to install some after-market features (aft cockpit controls, a flybridge grill, and a video

camera) and make certain repairs. The yacht remained located at SIYS' facility, although

plaintiff had access to and use of it as he wished.

The reverse side of the purchase agreement provided:

> DEALER MAKES NO WARRANTIES EXPRESS OR IMPLIED OF, IN ANY
> YACHT OR ITEM PURCHASED HEREUNDER AND NO WARRANTIES OF
> MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE
> INTENDED. WARRANTY, IF ANY, OF ANY ITEM PURCHASED
> HEREUNDER SHALL BE SOLELY THE WARRANTY GIVEN BY THE
> MANUFACTURER.

Carver provided a limited express warranty. This document included, among other

things, Carver's warranty that the yacht "will be free from defects in material and workmanship

---

[1] The salvage costs were $122,995. The sum of the purchase price and removal costs is the amount requested in this
suit.

for one (1) year from delivery to the original retail owner... ." It further stated that "for this limited warranty to be valid, Carver must receive a Warranty Registration Form, duly completed and signed by the Owner, within fifteen (15) days of delivery" of the yacht, and that the retail dealer (here, SIYS) is responsible for sending the signed registration form to Carver. Finally, this express warranty excluded all implied warranties, including merchantability and fitness for a particular purpose, and stated that "[y]our acceptance of delivery of the warranted Marquis yacht constitutes your acceptance of the terms of this limited warranty."

While the yacht was at SIYS, plaintiff was permitted, and evidently encouraged, to sail it. Plaintiff requested training on the yacht, so SIYS provided him with a captain who tutored him, onboard, for five to six hours. Plaintiff used the yacht four or five times, for a maximum of fifteen hours, before the incident in question. The stern thruster was not functioning at times while plaintiff had use of the yacht and SIYS performed repairs on it.

Plaintiff never had title to the yacht, nor did he sign Carver's "Warranty Registration," SIYS' "Notice of Owner's Acceptance of Vessel," or SIYS' "Customer Warranty Acknowledgment." The yacht was never registered. He did sign SIYS' "Purchase Agreement," which, as noted above, had SIYS' warranty exclusion in it.

On July 15, 2006, plaintiff, with his wife Susan, his teenage son, Jeff, one of Jeff's friends, and their two dogs, left SIYS' facility around 11:00 a.m. The group arrived at Horseshoe Cove a short time later, where they intended to have lunch and swim. At the point of anchorage, the water depth was approximately ten to fourteen feet and the yacht's draft (the distance between the water's surface and the bottom of the yacht) was five feet.

When the time came to move from their spot, plaintiff put the engine to idling speed to ensure that the propellers were not rotating. His son, Jeff, used a yacht hook to position the anchor into the bow, but lost his grip on the hook and dropped it into the water. As the others on the yacht went to retrieve it, the yacht began to drift. By the time they returned to the cockpit, the yacht had come into contact with a sandbar, causing the bow to swing around. Plaintiff stated that he cut off the engines and engaged both the stern and bow thrusters. He testified at deposition that he engaged the stern thruster "three or four times" for fifteen seconds at the most. He does not know firsthand if the stern thruster responded (his wife could not see any water churning as a result of the thruster operating and he therefore concludes that it was not), but in any event, the yacht was still unable to move. At least a minute later, plaintiff's wife and the children smelled something burning and saw smoke rising out of the port engine vent. At that point, plaintiff entered the main salon and shut down the electrical system and generator.

Returning to the controls, plaintiff called the Coast Guard for help. In the meantime, he directed everyone on board to put on life jackets and gather on the stern platform. Plaintiff's wife scoured the yacht in search of one of the dogs, which was missing. As the floors were beginning to melt, the family was taken from their yacht by another vessel.

Within ten minutes of their departure from the yacht, it became engulfed in flames. Less than a half hour after the initial call, the Coast Guard arrived and worked to put out the fire. Its efforts were to no avail, and the yacht burned down to the waterline. After two hours and 42 minutes, the fire was extinguished, at which point the skeleton of the yacht drifted into a rock pile and grounded. It was estimated that 20 gallons of fuel remained on board, indicating that approximately 380 gallons burned in the fire.

The yacht was equipped with a Kidde FM200 ECS series fire suppression system in the forward engine bulkhead in the engine room. This was the only fire suppression system on the yacht, and was designed to extinguish fires in the engine room. A fire alarm and strobe light were also installed in the engine room, although plaintiff is uncertain whether the alarm went off or not.

The night of the fire, the Coast Guard directed plaintiff to place a $100,000 bond or to remove the wreckage that night. Whichever route he chose, he was advised that the wreckage needed to be removed immediately. Plaintiff personally gave that bond. The Coast Guard called plaintiff multiple times each day for the next few days, inquiring as to his removal plan.

SIYS learned of the accident by Sunday, July 16, 2006, the day after the incident. SIYS notified Carver shortly thereafter. Plaintiff's claim adjuster at The St. Paul Travelers Companies, Inc. ("Travelers"), Cynthia Love, who worked out of Florida, learned of the incident when it was assigned to her the following Monday, July 17, 2006. Ms. Love hired Paul Case, a marine surveyor, to represent Travelers locally. Mr. Case was directed to protect the scene.

Ms. Love was in contact with the Coast Guard, who advised her to clear up the wreckage as quickly as possible. The Coast Guard informed her that, in the event the wreckage was not removed quickly, it was prepared to perform the salvage itself. As a result, Ms. Love directed Mr. Case to obtain bids from local companies for the salvage. By July 19, 2006, the Coast Guard had hired a barge and crane and they were in place.

One option for the salvage, which would have cost upwards of $300,000, called for the construction of a cradle and lift under the yacht with the goal of raising the yacht in one piece. This was known as the "full staging and retrieval" option. It was estimated to require two weeks

time to prepare. The other option, known as the "removal and disposal" option, was to use a crane and remove the wreckage in pieces. This was expected to take two to three days at a cost of $52,000, plus pollution containment costs. Travelers opted to go the "removal and disposal" route. Plaintiff claims that the decision was intended to maximize cost efficiency. Since there was no guarantee that the more expensive option would raise the yacht in one piece, Ms. Love felt that it was not worth the additional cost. However, Ms. Love noted, in making the decision, that that method of recovery would, "of course, jeopardize our subrogation potential as well as our C&O investigation."

The Coast Guard approved Travelers' salvage and removal plan at 3:00 p.m. on July 19, 2006. The process began in earnest on the morning of July 20, 2006. Travelers had forensic experts at the removal site. By the end of the second day, approximately 95 percent of the wreckage was removed. The combination of the intense fire and method of salvaging left the evidence of the incident "substantially destroyed," although certain components, including at least part of the stern thruster, were recovered.

## DISCUSSION

Plaintiff advances several theories of liability, depending on the particular defendant, without clearly defining some of them. As to defendant Carver, he claims breach of contract, breach of express and implied warranties, and corresponding claims under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301 *et seq*. ("MMWA"), all arising from what plaintiff describes as "defects" in the yacht. The alleged defects appear to be (a) that the Volvo-manufactured stern thruster caused the fire; and/or (b) that the Kidde fire extinguisher system, sold as original equipment with the yacht, failed to extinguish the fire once it started. His theory as to defendant

Volvo also is based on express and implied warranty and MMWA claims, similarly alleging that Volvo supplied "a defective SP-1300 stern thruster, and its related accessories." As to SIYS, the claims are apparently breach of contract; negligent repair of the yacht; and violations of the MMWA. The contract claims appear to allege alternatively that (a) SIYS, by delivering a "defective" yacht, breached the contract; or (b) SIYS never "delivered" a yacht at all, as it burned before plaintiff formally took delivery, even though plaintiff paid for the yacht, and SIYS thereby breached the contract by not delivering a yacht.

## I.     Summary Judgment Standard

A court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). In its analysis, the court shall "resolve all ambiguities and draw all reasonable inferences against the moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). The burden of demonstrating the non-existence of any genuine issue of material fact falls on the party moving for summary judgment. Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). If the moving party carries that burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P 56(e). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). Assertions and conclusions made, without supporting arguments or facts, are insufficient to prevent a grant of summary judgment. BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996). If no

reasonable jury could return a verdict in favor of a party, summary judgment against that party is

appropriate.  See Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 784 (2d Cir. 2003).

## II.    Warranty-related theories

A common thread essential to most of plaintiff's theories is that there was some defect in

the yacht or its components.  Plaintiff recognizes that he must demonstrate a factual issue as to

the existence of such a defect.  From plaintiff's perspective, this is a straightforward exercise:

the yacht burned; yachts are not supposed to burn; plaintiff did not do anything to cause it to

burn; therefore, something in the yacht was defective.  Plaintiff relies on the language of cases in

the field of strict products liability or other torts, such as Jarvis v. Ford Motor Co., 283 F.3d 33

(2d Cir. 2002) (plaintiff proved negligent design by showing that van suddenly accelerated

without human interaction; plaintiff did not have to show why the van suddenly accelerated), and

Halloran v. Virginia Chemicals, Inc., 41 N.Y.2d 386, 393 N.Y.S.2d 341 (1973) (in strict products

liability action, if plaintiff proves that product did not function as intended, causing his personal

injury, and excludes all causes of the accident not attributable to the defendant, fact finder may

infer that the product is defective even without proof of the particular defect).  These cases

essentially state that when circumstantial evidence points to a defective product that causes a

personal injury, a plaintiff need not prove the specific defect at issue.

As the Second Circuit noted in Jarvis, the New York case law in this area includes dicta

that "may not always be reliable." Jarvis, 283 F.3d at 63 n.16.  Despite less than precise

linguistic distinctions used by the courts when tort theories are brought together with contract or

warranty theories, the theories often remain distinct, and different analyses and consequences can

flow from them.  Personal injury cases often have to be analyzed differently than cases for

economic loss; tort theories often have to be analyzed differently than breach of warranty

theories. As the New York Court of Appeals held in Denny v. Ford Motor Co., 87 N.Y.2d 248, 254-55, 259, 639 N.Y.S.2d 250 (1995):

> Although the products liability theory sounding in tort and the breach of implied warranty theory authorized by the UCC coexist and are often invoked in tandem, the core element of "defect" is subtly different in the two causes of action. ...

> This distinction between the "defect" analysis in breach of implied warranty actions and the "defect" analysis in strict products liability actions is explained by the differing etiology and doctrinal underpinnings of the two distinct theories. The former class of actions originates in contract law, which directs its attention to the purchaser's disappointed expectations; the latter originates in tort law, which traditionally has concerned itself with social policy and risk allocation by means other than those dictated by the marketplace.

Denny observed that this distinction is particularly apparent in comparing design defect claims to breach of implied warranty claims because the former requires application of a risk/utility analysis, whereas the latter simply depends on the expectation of the consumer. Id. at 256 n.3, 639 N.Y.S.2d 258 n.3. In manufacturing defect cases, the Court implied, the strict liability test is closer to the implied warranty test because in both, "the flaw alone is a sufficient basis to hold the manufacturer liable without regard to fault." Id.[2] See also Castro v. QVC Network, Inc., 139 F.3d 114 (2d Cir. 1998) (comparing the meaning of "defect" in strict liability and implied warranty claims). There is also a distinction between negligence or strict liability claims, on the one hand, and breach of express warranty claims; the latter, including those involving warranties against "defects" in a product, are judged according to the meaning of the words of the warranty, which may draw upon the reasonable expectation of the both the consumer and the warrantor. See Scientific Components Corp. v. Sirenza Microwave Devices, Inc., No. 03-cv-1851, 2006 WL 2524187 (E.D.N.Y. Aug. 30, 2006) (where seller expressly

---

[2] This statement is indicative of the tendency noted in Jarvis for courts to use broad language in defective products cases. Obviously, "the flaw alone" is *not* enough for there to liability. At the very least, causation remains a necessary element; nor is the issue addressed as to whether there is a distinction between the test for determining a "flaw" in strict liability cases and warranty cases.

warranted that product would be without "defect in material or workmanship," "defect" should be defined "according to its plain and ordinary meaning," citing, In re Prudential Lines, Inc., 158 F.3d 65, 77 (2d Cir. 1998)).

Locating the proper analytical framework here is made more difficult by plaintiff's ambiguity on the factual issue of what might have caused the fire. He asserts only that "the fire was caused by a defect within the yacht, inclusive of the stern thruster and its accessories." No more detail is offered. Plaintiff also, or perhaps alternatively (he does not say which) claims that "the Kidde FM200 ECF fire extinguishing system was defective, either in its design or its manufacture, which prevented it from extinguishing the fire. ..." Plaintiff again provides no more detail as to what went wrong with the fire extinguishing system.

Plaintiff's opposition to the summary judgment motions is equally vague about what legal theory he is asserting against each defendant. His analysis of the defect issue does not mention Volvo at all (even though it is Volvo's stern thruster that his claim identifies). His only reference to Carver or SIYS is to refute their claim that *res ipsa loquitur* cannot apply because plaintiff had possession of the yacht at the time of the fire (plaintiff claims they had more control than he did).[3] His statement of the applicable legal test is taken from cases with strict liability claims, which he has not pled: "a manufacturer, seller, dealer and/or distributor may all be held strictly liable for placing into the stream of commerce a defective product which causes injury." Even as to this supposed strict liability claim, plaintiff has not specified whether he is claiming a design, manufacturing, or warning defect; he simply notes that the law recognizes all of these claims, suggesting that he would be happy with any of them that the jury finds adequate.

---

[3] Neither party has directed the Court to any case for economic loss only applying *res ipsa loquitur*. In any event, defendants did not have exclusive control of the yacht either prior to or on the day of the fire so the doctrine does not apply. See Santa Maria v. Metro-North Commuter R.R., 81 F.3d 265 (2d Cir. 1996).

Plaintiff's reference to strict products liability cases involving personal injuries is misplaced. His claim is only for economic loss. In both admiralty and under New York law, the "economic loss doctrine" holds that tort recovery in strict products liability and negligence against a manufacturer is not available to an end-purchaser of a product where the claimed losses flow from damage to the property only and personal injury is not claimed. See East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295 (1986); 532 Madison Ave Gourmet Foods, Inc v. Finlandia Ctr, Inc, 96 N.Y.2d 280, 727 N.Y.S.2d 49 (2001); Bocre Leasing Corp. v. General Motors Corp, 84 N.Y.2d 685, 621 N.Y.S.2d 497 (1995); Bellevue S. Assoc v. HRH Constr. Corp, 78 N.Y.2d 282, 574 N.Y.S.2d 165 (1991). A plaintiff is so limited by the economic loss rule even where an allegedly defective product is or may be unduly hazardous. Bocre Leasing Corp., 84 N.Y.2d at 691-92; 621 N.Y.S.2d at 500. The rule applies to the economic loss to the product itself, as well as to consequential damages resulting from the defect. Id.

The economic loss doctrine is based on the determination that where only the product is injured, the usual tort concerns for safety are not triggered. Id. When the damage claimed is to the product itself, it "is most naturally understood as a warranty claim." East River SS Corp v. Transamerica Delaval, 476 U.S. at 872, 106 S.Ct. at 2302. In such cases, the owner's loss is essentially the value of the product, which is a loss that can be insured, id.; Bocre Leasing Corp., 84 N.Y.2d at 689, 621 N.Y.S.2d at 498, and, indeed, in the present case, it was insured. A product injuring itself is not the kind of harm against which public policy requires manufacturers to protect outside of their contractual undertakings. Id. As the Supreme Court has stated allegorically in the maritime context, to allow tort recovery to purchasers when there is injury to

the product only would result in "contract law [ ] drown[ing] in a sea of tort." East River SS

Corp v. Transamerica Delaval, 476 U.S. at 874, 106 S.Ct. at 2300.

Once plaintiff's legal theory is rationalized to only contract and warranty claims, which is indeed all that he has pled even though he has briefed the case as a tort case, at least some of the issues here are easily resolved. First, the claims against Volvo cannot stand. There is no evidence that Volvo ever gave an express warranty of the stern thruster. There can be no implied warranty claim because there is no privity between Volvo and plaintiff and plaintiff has alleged only economic injury. See County of Suffolk v. LILCO, 728 F.2d 52, 63 (2d Cir.1984); American Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc., No. 02-cv-814C, 2007 WL 2743449, *4-5 (W.D.N.Y. Sept. 18, 2007).

Any claims against SIYS for having delivered a "defective" yacht are similarly without merit. SIYS disclaimed all warranties, express and implied, in the contract of sale. The case is no different than Bocre, where the product was purchased "as is." Allowing plaintiff to claim that the yacht was somehow non-conforming to the contract because it had a design or manufacturing defect that caused it to malfunction would be to circumvent the warranty exclusion, and thus eviscerate the contractual bargain that the parties made. From an economic perspective, plaintiff was content to rely upon his insurance coverage to cover what happened here, see East River; Bocre, and his insurance company did not require greater protection as a condition to underwriting that risk.

It is true that plaintiff's first claim against SIYS is entitled "Breach of Contract and Negligence," and contains a list of formulaic negligence allegations against SIYS. That list does not save plaintiff's claim for two reasons. First, the economic loss rule precludes all tort claims,

not only strict liability claims, in cases not involving personal injury. AKV Auto Transport, Inc. v. Sysosset Truck Sales, 24 A.D.3d 833, 806 N.Y.S.2d 254 (3d Dep't 2005), is an analogous case involving a fire of undetermined causes. There, the plaintiff's truck burned twice, once when the defendant dealer from which the plaintiff had bought the truck installed a light bar, and again after the defendant repair company had rewired other parts of the truck. Because the dealer had disclaimed all warranties, the plaintiff could not maintain an action for breach of express or implied warranty, and "since plaintiff here alleges only economic loss arising out of the product itself – that is, the truck and its component parts – against the retail seller of that product, the rule bars plaintiff's remaining [tort] claims… ." Id. at 835, 806 N.Y.S.2d at 256. See also Suffolk County v. Long Island Lighting Co., 728 F.2d 52, 62 (2d Cir.1984) (under the economic loss rule, "a negligence action seeking recovery for economic loss will not lie.").[4]

A second and related reason why plaintiff's negligence claim against SIYS fails is that there is nothing in the summary judgment record upon which a reasonable jury could predicate a finding of negligence. The only circumstantial evidence of negligence that plaintiff offers is that the stern thruster had not activated on some, but not all, prior occasions; that SIYS had performed repairs on it; and that plaintiff had engaged the thruster before he noticed the fire.[5] Based on this, he would have a jury find that SIYS did something negligent to the stern thruster,

---

[4] Although there are a few exceptions to this rule, see e.g. Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8 (2d Cir. 2000) (rule inapplicable in "in the limited class of cases" involving professional malpractice), plaintiff's boilerplate list of conclusory allegations is so vague that it suggests no exception under which he might fall, and he has submitted no evidence to amplify on those allegations.

[5] Plaintiff also claims that there is a "history of fires resulting from Volvo stern thrusters." The record does not support that statement. It refers to one fire of undetermined origin that may or may not have involved the thruster. Other problems with the model 1300 thruster were only unintentional activation, of which there is no evidence here, and activation problems pertaining to thrusters other than the model 1300.

or that it arrived predisposed to start a fire; that it did in fact start a fire; and that SIYS was therefore negligent in some manner.

This theory would be too speculative to submit to a jury standing alone. But it does not stand alone. Notwithstanding the manner in which Travelers chose to salvage the yacht, the salvage company was apparently able to preserve some components, including the motor of the stern thruster. Volvo had a fire consultant examine it, and he concluded, after completely disassembling the motor, that there was nothing wrong with it; that the aluminum box containing the circuit cards showed no scorch marks or signs of melting; and that the motor of the stern thruster showed no other evidence of fire damage. Based on this analysis, plaintiff concedes that the fire did not occur in the motor of the stern thruster, and posits that it must have occurred in some other part of the stern thruster. But as to what part of the stern thruster, or why one should think it was in the stern thruster at all, plaintiff offers only the intermittent non-activation problem that the stern thruster had experienced, referred to above, prior to the fire. Plaintiff's argument would call for the jury to speculate and could not reasonably support a determination in his favor.[6] See AKV Auto Transport, 24 A.D.3d at 835, 806 N.Y.S.2d at 256 (plaintiff's assertion that the repair shop's rewiring must have caused fire was "pure speculation and insufficient to raise an issue of fact").

Finally as to SIYS, even if plaintiff could raise a factual issue as to defect, the record does not show any factual issue as to causation beyond speculation. Accepting *arguendo* plaintiff's conclusion that the thruster did not activate (based on his wife's reported observation that no water was churning), that does not mean that it burst into flames on this boat at this

---

[6] There is no evidence of any defect in the Kidde fire extinguishment system. Plaintiff simply did not recall hearing a fire alarm from the system. No reasonable jury could find that a fire extinguisher is defective simply because a structure in which it was contained burned.

particular time. It simply did not turn on. According to plaintiff, that had happened on prior

occasions, and no fire resulted. It does not logically follow, without evidence, that an

inoperative machine is an incendiary machine. There is no reasonable basis for concluding that

on this one occasion, the thruster not only failed to activate, but ignited.

As to Carver, the only party that actually issued an express warranty against defects,

plaintiff's legal theory is again vague. Apparently referring to the language in the warranty that,

to be valid, Carver must receive a Warranty Registration Form, duly completed and signed by

the Owner, within fifteen (15) days of delivery, plaintiff appears to take the position that

Carver's warranty of freedom from defects for one year never came into existence. According to

plaintiff, "Carver's limited warranty starts when signed by the dealer and the customer, which

never occurred." If this is correct, then there is no express warranty. In addition, because this is

not a personal injury case, any claim for implied warranty would be barred by the absence of

privity, see County of Suffolk v. LILCO; American Ref-Fuel Co. of Niagara, LP v. Gensimore

Trucking, Inc.,[7] even it is was not disclaimed by the language of the limited warranty itself

(which it is). See Kolle v. Mainship Corp., No. 04-cv-711, 2006 WL 1085067, *5 (E.D.N.Y.

April 20, 2006).[8]

Putting aside plaintiff's apparent admission that Carver's express warranty never became

operative, plaintiff's claim could not succeed under the warranty in any event for the same

reasons that he cannot show that SIYS was negligent. There is simply insufficient evidence upon

---

[7] Plaintiff apparently does not recognize that although Codling v. Paglia, 32 N.Y.2d 330, 345 N.Y.S.2d 461 (1973), eliminated the requirement of privity in personal injury cases based on breach of implied warranty, it did not eliminate the requirement of privity in cases seeking recovery of only economic loss.

[8] Plaintiff strangely cites Kolle for the proposition that an implied warranty runs between a remote seller and consumer. The case simply holds that a remote seller that extends an express warranty may validly disclaim implied warranties. Contrary to plaintiff's claim, the decision expressly noted that, in a case for only economic loss, "[i]t is clear that New York law requires privity in order for Plaintiff to assert a breach of an implied warranty claim." 2006 WL 1885067 at *5.

which a jury could reasonably find that there was anything wrong, i.e., "defective," in the language of the express warranty, with the stern thruster or any other component of the yacht, or that if there was, it caused a fire, for the reasons set forth above.

Even in the tort cases upon which plaintiff relies, the primary requirement is that a plaintiff must prove that the product did not perform as intended. See Halloran. Plaintiff contends that requirement is easily met since "the yacht was not intended to catch fire and burn." But plaintiff's argument is simplistic. This case is not like Jarvis, where an automobile accelerated suddenly and resisted all efforts by the driver to decelerate it. An automobile is supposed to accelerate; it is not supposed to accelerate, however, of its own volition or while depriving a driver of the ability to stop it. Acceleration is integral to the performance of the automobile so that when acceleration has gone wrong in this manner, the automobile itself has likely gone wrong, and causation necessarily follows.

In contrast, an unintended fire, whether in a yacht, a house, or any enclosed space, is not necessarily related to the otherwise proper functioning of the conveyance or place in which it occurs. A fire on a yacht is not part of the yacht's performance. The yacht is not "performing" when it burns; at the very least, plaintiff has to offer some evidence of a causal relationship between the fire and the yacht's performance. Plaintiff may have an appealing intuitive argument that "something" must have gone wrong with the yacht to cause the fire, but an appeal to a jury's intuition without more evidence than plaintiff offers here is too speculative to support a verdict in his favor.

The New York Court of Appeals has recently made clear that a case cannot reach the jury simply as the result of an incendiary event near or involving a mechanical device. In Ramos v.

Howard Industries, Inc., 10 N.Y.3d 218, 855 N.Y.S.2d 412 (2008), the plaintiff was a power lineman working on a transformer. When he activated it, it exploded, injuring him. Because he had delayed reporting the injury, the transformer could not be located by the time the case commenced. In support of its motion for summary judgment, the defendant manufacturer of the transporter offered an expert opinion that if the transformer had been defective by reason of an electrical fault, it would have been virtually impossible for it to have successfully passed the defendant's post-production inspection process and reach the market. The plaintiff countered with his own expert's opinion that the explosion had in fact been caused by a defect in specific, identified electrical parts of the transformer; that the defects had generated excessive heat; that the heat had superheated oil in the transformer; and that the transformer had therefore exploded. The Court of Appeals reversed the Appellate Division's denial of summary judgment and dismissed the case, holding that in light of the inability of the expert retained by plaintiff to examine the transformer, plaintiff's case was too speculative to raise a factual issue: "Although a plaintiff is not required to identify a specific defect in a circumstantial case, plaintiff's theory here – that the explosion resulted from a manufacturing defect in the form of an 'internal electrical fault' – is pure speculation." Id. at 224, 855 N.Y.S.2d at 415.

In the instant case, plaintiff's evidence is even more speculative than that rejected in Ramos. At least Ramos had an expert who had a specific theory of what went wrong; here, plaintiff relies on little more than the occurrence of the incendiary event itself. Plaintiff is correct that an expert opinion is not required where the circumstantial evidence points to a defect, but as noted above, there has to be some evidence that there was a defect of some sort; it cannot be assumed merely because a fire or explosion occurred.

The second requirement in the personal injury cases upon which plaintiff relies is that plaintiff must exclude all other causes of the fire besides a defect in the product itself. See Halloran. Plaintiff contends that he need not meet this requirement for purposes of defeating a motion for summary judgment. That argument, however, is foreclosed by the recent decision in Ramos, which was based in part on the plaintiff's failure to exclude all other causes: "[A] reasonable jury could not conclude that all other causes of the transformer explosion were excluded, and thus, plaintiff's manufacturing defect claim fails as a matter of law." Id.

Moreover, application of the requirement excluding other causes is unworkable in this case because plaintiff is so indefinite about the claimed defect. It is not meaningful to exclude "other causes" when plaintiff offers only broad speculations, i.e., "a defect within the yacht, inclusive of [but apparently not limited to] the stern thruster and its accessories," and/or "the Kidde FM200 ECF fire extinguishing system was defective, either in its design or its manufacture... ." In effect, nothing can be excluded when everything is included.

This is a particular problem because plaintiff has brought a multi-defendant case. As he states: "The only other entities [besides plaintiff] to ever have possession of the yacht before the fire were Carver and SIYS." Of course, Volvo also had possession of the stern thruster at some point. But Carver, SIYS and Volvo are separate entities, and plaintiff's theories of the case would allow the jury to find that either Carver and Volvo supplied a defective thruster *or* that SIYS negligently installed or repaired it. Thus, as to Carver and Volvo, plaintiff has not excluded conduct by SIYS, and as to SIYS, he has not excluded conduct by Carver or Volvo. Plaintiff would have me simply put the alternatives to the jury and have the jury pick one or more, but each is equally speculative because, in part, it does not exclude its alternative. See AKV Auto Transport (where fire might have been caused by either of two defendants' actions

but there was insufficient evidence to raise an issue of fact as to either one individually, summary judgment was properly granted).

Finally, plaintiff has not pointed to any provision of MMWA that would operate independent of his state law warranty claims. Since the state law warranty claims fail, his MMWA claims fail as well. See Kolle v. Mainship Corp.[9]

## III.  Other UCC-related theories

### A.  Non-delivery

As an alternative to showing the existence of a triable issue as to whether there was a defect in the yacht, plaintiff contends that he does not have to show a defect because, in fact, Carver and SIYS never "delivered" the yacht. Plaintiff's implication is that by not delivering the yacht, Carver and SIYS breached the contract. According to plaintiff, this failure to deliver is due to the fact that: (a) there was a punch list of items remaining to be performed by SIYS, and thus any purported delivery did not comply with the "perfect tender" rule; (b) plaintiff never signed certain forms, some used by Carver and some used by SIYS, to show a completed delivery; and (c) plaintiff never registered title to the yacht. As a further alternative, plaintiff contends that even if there was an attempt at delivery, he never accepted it.

The Carver documents upon which plaintiff relies, which Carver appears to require for its warranty and internal records purposes, are immaterial to any claim of breach of contract.

---

[9] It is not necessary for me to determine the spoliation issue that forms a major part of some of defendants' arguments. However, if I did, I could not find as a matter of law that Travelers acted unreasonably in choosing the less expensive salvage method. The record contains evidence that the more expensive salvage method would have taken weeks to set into place, and that the Coast Guard was pressing for immediate recovery, the failure of which would have caused the Coast Guard to undertake the salvage operation on its own. It is also not clear that the more expensive salvage method would have yielded more evidence. Thus, the issue of the reasonableness of Travelers' efforts (as plaintiff's agent) presents a question of fact, albeit an immaterial one based on the disposition above.

However, simply because I am not imposing a sanction on plaintiff as defendants request does not mean that plaintiff gets any benefit from Travelers' decision. As Ms. Love recognized, the failure to obtain useable evidence from the yacht to support plaintiff's claim may have deprived plaintiff of the proof he needed to maintain this action.

Plaintiff had no contract with Carver. He argues that SIYS was an agent of Carver (or perhaps that Carver was an agent of SIYS), but the record is devoid of any facts upon which an agency relationship either way could be inferred; every fact shows that Carver is a manufacturer and SIYS is an independent authorized dealer that happens to sell Carver products, among those of other manufacturers. Just by way of example, Carver's authorizing agreement with SIYS provided that "[u]nder no circumstances shall the Dealer ... be deemed the agent, employee or representative" of Carver and that "[t]he relationship hereunder shall be deemed to be that of buyer and seller with the Dealer purchasing Products for resale under the provisions hereof for the Dealer's own account." There is no evidence in the record to contradict that statement, and thus no breach of contract claim can stand against Carver.

As to SIYS, although plaintiff never signed its "Notice of Owner's Acceptance of Vessel" form or entered into a rental agreement for a slip at SIYS, that was not required to effect delivery of the yacht under the UCC. Section 2-308 states that "unless otherwise agreed, the place for delivery of goods is the seller's place of business." Plaintiff thus did not have to bring in a trailer and take the yacht away to affect a delivery. The facts are undisputed that once he signed the contract, paid the bulk of the purchase price and gave a promissory note for the rest, he asserted dominion and control of it, taking it out when he wanted, as he did on the day of the fire. He held himself out as the owner of the yacht, buying insurance on it, putting in an insurance claim for its loss (and accepting payment), and obtaining a Certificate of Documentation in his name from the Coast Guard. When the Coast Guard demanded that undertake salvage efforts, he did not tell it to contact SIYS as the "owner" of the yacht; he and his insurer took responsibility for it.

Plaintiff's reliance on the "perfect tender" rule to avoid the conclusion of delivery is misplaced. That rule provides a framework to determine whether a buyer's rejection of goods is proper. When a seller makes an imperfect tender, nothing happens by mere operation of law; should the buyer not reject within a reasonable time, he waives his right to challenge the alleged imperfection. Instead of an imperfect tender invalidating a transaction after material changes in the parties' positions have occurred, as plaintiff is attempting to do here, the perfect tender rule gives the buyer a provisional right to reject the goods "within a reasonable time after delivery or tender." UCC § 2-602(1). In the event of such a rejection, the seller is given a reasonable time to cure the claimed defects. See Vitol S.A., Inc. v. Koch Petroleum Group, LP, No. 01 cv 2184, 2005 WL 2105592, 10 (S.D.N.Y. Aug. 31, 2005) ("The primary reason for the requirement of a notice of rejection is to provide the seller with an opportunity to cure or to allow the seller to attempt to minimize its losses.).

However, plaintiff does not contend that he rejected the yacht on the "punch list grounds" until after the yacht burned, and thus SIYS had no opportunity to "cure" any defects in the face of a potential rejection. The punch list items to which plaintiff refers – comprised mostly of items like "scratches on kitchen table;" "clean inside carpeting"; and "are the master bath shower doors supposed to rattle a lot when underway?" – were never items that caused plaintiff to reject or even to threaten to reject the yacht. It is only now that the yacht is destroyed that plaintiff seizes upon them as an indication of non-delivery. The equipment additions that the contract included fall into that same category. They did not impact on the delivery of the yacht to plaintiff.

Indeed, the majority of items on the punch list were sufficiently minor that even under the perfect tender rule, they may not have supported rejection as opposed to an adjustment of the

purchase price, as such an attempted rejection might be indicative of bad faith. See UCC §1-203; T.W. Oil, Inc. v. Consol. Edison Co. of New York, Inc., 57 N.Y.2d 574, 582, 457 N.Y.S.2d 458, 463 (1982) ("In contrast [to the perfect tender rule], to meet the realities of the more impersonal business world of our day, the code, to avoid sharp dealing, expressly provides for the liberal construction of its remedial provisions (§ 1-102) so that 'good faith' and the 'observance of reasonable commercial standards of fair dealing' be the rule rather than the exception in trade."). The punch list items certainly would not have supported rejection without a reasonable opportunity for SIYS to cure them. See UCC §2-106 comment 2 ("the seller is in part safeguarded against surprise as a result of sudden technicality on the buyer's part by the provisions of § 2-508 on seller's cure of improper tender or delivery"); T.W. Oil, Inc., 57 N.Y.2d at 582, 457 N.Y.S.2d at 463 ( "[T]he seller's right to cure a defective tender ... was intended to act as a meaningful limitation on the absolutism of the old perfect tender rule, under which, no leeway being allowed for imperfection, there was, as one court put it, just 'no room ... for the doctrine of substantial performance' of commercial obligations", quoting Mitsubishi Goshi Kaisna v. J. Aron & Co., 16 F.2d 185, 186 (2d Cir.1926) (Learned Hand, J.)).[10]

In the absence of any evidence that plaintiff ever rejected the yacht, plaintiff's alternative position is that he never "accepted" delivery. Again, however, the UCC requires a contrary conclusion. Section 2-606 specifies three methods of acceptance. Plaintiff's position – that he could only accept by signing the relevant acceptance forms or advising SIYS expressly that he was accepting – would fall under §2-606(1)(a) (acceptance occurs when the buyer "signifies that the goods are conforming or that he will retain them in spite of their non-conformity"). Section 2-606(1)(b), however, provides that acceptance occurs when, after a reasonable time for

---

[10] As to plaintiff's claim that he never titled the yacht in his name, UCC § 2-401 states that "[e]ach provision of this Article with regard to the rights, obligations and remedies of the seller [and] the buyer ... applies irrespective of title to the goods except where the provision refers to such title."

inspection, the buyer "fails to make an effective rejection." In addition, § 2-606(1)(c) provides

the further alternative of deeming acceptance made if the buyer "does any act inconsistent with

the seller's ownership ... ." Both subsections (1)(b) and (1)(c) show an acceptance here.

Plaintiff used the yacht for nearly three months before the day of the fire. Yet as noted

above, at no time did plaintiff reject the yacht as non-conforming. Having failed to give any

indication of rejection until after the fire, plaintiff accepted the yacht under § 2-606(1)(b). See

Ask Technologies, Inc. v. Cablescope, Inc., No. 01 Civ. 1838, 2003 WL 22400201 (S.D.N.Y.

Oct.20, 2003) (where buyer complained, complaints were resolved, and buyer continued to use

products for months after complaining, acceptance occurred); EPN-Delaval, S.A. v. Inter-Equip,

Inc., 542 F. Supp. 238 (S.D.Tex.1982) (where buyer stored but did not use goods prior to

inspection and rejection, acceptance occurred under § 2-606(1)(b) since he did not inspect and

discover defect within reasonable time).

In addition, plaintiff engaged in a number of acts inconsistent with ownership in SIYS.

Some of these are noted above in the context of determining whether the yacht was delivered to

plaintiff: holding himself out as the owner of the yacht, buying insurance on it, putting in an

insurance claim for its loss, and obtaining a Certificate of Documentation in his name from the

Coast Guard. Others include personally guaranteeing payment to the Coast Guard for recovery

of the yacht. In addition, he took out his entire family, a family friend, and two dogs for a full

day trip, something an owner, not a mere test driver, would do. Indeed, even in the pleadings

and his deposition in this action, plaintiff has repeatedly described himself as the owner of the

yacht. No reasonable jury could find that these actions, singly and collectively, are insufficient

to constitute an acceptance under § 2-606(1)(c). See .e.g., DiRocco v. Michigan Mut. Ins. Co.,

692 F.Supp. 578 (E.D.Pa.1988) (having new truck painted in buyer's company colors was

inconsistent with seller's ownership); Weil v. Murray, 161 F.Supp.2d 250 (S.D.N.Y. 2001) (cleaning and restoring of painting constituted acceptance, even though it may have increased painting's value, because such actions were inconsistent with the seller's ownership).

## B. *Risk of Loss*

Finally, plaintiff contends that the risk of loss on the day of the fire remained with SIYS, either because SIYS was in breach of the contract at the time of fire, thus implicating UCC § 2-510 (risk of loss remains with seller if the tender or delivery of goods "so fails to conform to the contract so as to give a right of rejection"), or alternatively, under UCC § 2-509(3), which passes the risk of loss to the buyer "on his receipt of the goods if the seller is a merchant ... ." (All parties acknowledge, of course, that SIYS is a merchant.)

For the reasons set forth above, plaintiff's claim that SIYS was in breach fails, and thus § 2-510 is inapplicable. Not only has plaintiff failed to demonstrate grounds for a rejection, but in fact he accepted delivery of the yacht.

Under § 2-509(3), plaintiff contends that he had not "received" the yacht. "Receipt" is defined as "taking physical possession." UCC § 2-103 (c). Of course, a yacht is not like a life jacket; it cannot be picked up and carried away. It is true that had plaintiff taken the yacht out of the water and moved it somewhere by trailer, the issue would be more straightforward. Nevertheless, plaintiff has put no evidence in the record to suggest that, although he had not yet signed the slip rental agreement with SIYS, he planned to berth it anywhere else. In any event, no consideration of constructive possession is necessary here. Plaintiff not only had unfettered access when he wanted, but he actually took the yacht out on several occasions, putting his entire family and a friend and dogs on it on at least one of those occasions. The "physical" part of the possession requirement is readily met.

Hughes v. Al Green, Inc., 65 Ohio St.2d 110, 418 N.E.2d 1335 (1981), is similar. There, a car buyer signed a purchase agreement on a Friday. The parties agreed that the buyer would take the car over the weekend, then bring it back Monday for installation by the dealer of specified after-market equipment and final delivery check. While the buyer used the car over the weekend, it was substantially damaged in a collision. Notwithstanding that the dealer had not yet performed the installation of the after-market equipment or the final preparation for delivery, the Court held that the risk of loss had passed to the buyer: "[T]he appellant-buyer had received possession of the automobile as partial execution of a merchant-seller's obligations under a purchase contract. Thus ... the appellant, as a buyer in receipt of goods identified to a contract, must bear the loss of the car's value resulting from the collision." Id. at 115, 418 N.E.2d at 1358.

Here, plaintiff had his and his family's feet on the deck, his hands at the helm, and the ability to take the yacht wherever he wanted it to go. With the undisputed dominion and physical access and control that plaintiff had prior to its destruction, a jury could not reasonably find that plaintiff had failed to receive the yacht. Accordingly, plaintiff's claim that SIYS retained the risk of loss fails.

## CONCLUSION

Defendants' motions for summary judgment are granted. The Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.

**SO ORDERED.**

s/Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
September 15, 2008